GEORGE W. ABBOTT *vs.* GEORGE E. B. JACKSON, and others.

Cumberland.    Opinion April 19, 1892.

*Negligence.    Way.    Landlord and Tenant.*

Where a driveway from a lumber shed, across a railroad track to the carriage way extending up and down a wharf, was an appurtenance belonging exclusively to the shed and the land on which it stood, *Held* : that it was the duty of the lessee of the land, who was owner of the shed, to maintain a reasonably safe means of access to the shed over the driveway.

The responsibility and burden of providing such driveway, or means of access, to his lessee's place of business does not rest upon the lessor or the owner of the land over which such access lies.

ON MOTION AND EXCEPTIONS.

This was an action on the case to recover damages for personal injury to the plaintiff caused by a loose plank in a crossing in the private railroad track on the west side of Brown's wharf in Portland; which crossing the plaintiff alleged the defendants negligently allowed to get out of repair, so that while driving over the same, the plaintiff was thrown from his jigger and his leg was broken. The action was tried before a jury in the Superior Court, for Cumberland County, and a verdict of two thousand dollars was rendered for plaintiff.

The case came to this court upon exceptions to the rulings of the presiding justice, in admitting testimony against defendant's objections; to the refusal of the presiding justice to give requested instructions; and to a specific portion of the judge's charge; also on a general motion for new trial.

The plaintiff in his declaration alleged that the defendants " owned, possessed, occupied and permitted others to use " Brown's wharf in Portland, over which the defendants had established, controlled and maintained a carriage way for the use of the public and persons rightfully passing over the same. That on the southwesterly side of said passageway, the defendants controlled and maintained a railroad track, which extended from Commercial street to the lower end of the wharf and " near a certain shed upon said wharf, which said shed was occupied by one Emery, a tenant of said defendants ;" that the defendants had established and controlled a crossing over said track for truck wagons for the use of the public and all persons rightfully passing over the same, extending from said way to said shed occupied by said Emery ; which said wharf, way, railroad track and crossing "the defendants were bound to keep in a safe and suitable condition and repair for such purposes and uses for all persons properly and rightfully upon and using the same ;" that the defendants so negligently maintained "said track and crossing over the same" that the same were unsafe by reason of a plank therein, which plank was not spiked down as it ought to have been ; that the plaintiff having occasion to pass over said "track and crossing," and having the right to pass over the same, and being in the exercise of due care drove over the

same "from said shed occupied as aforesaid by said Emery," to said way, was injured in consequence of the defect in said plank.

It appeared from the testimony of the parties that Brown's Wharf, on which the accident happened, was owned by J. B. Brown for many years, and ever since his death has been held by the defendants,— trustees under his will. From Commercial street, the passageway for teams extends down the middle and to the lower end of the wharf. On the west side of the passageway, a private railroad track extends from Commercial street to near the lower end of the wharf.

Prior to his death, Brown leased to Mark P. Emery, as tenant at will, but with no agreement to make repairs, a vacant lot on the west side and near the lower end of the wharf; which tenancy continued from that time until after the time of the accident to the plaintiff. The lot leased to Emery was mostly earth filling, and on it Emery erected four sheds, known as "Emery's sheds," which were used solely for Emery's private business for storage purposes. Each shed was numbered, No. 4 being farthest down the wharf. Each shed had a wide doorway in the side next the passageway, and Emery had a right of way from the sheds to the passageway up the wharf.

When first constructed, the track on the west side did not extend down the wharf to the Emery sheds, but, some years after he had built his sheds, at his request and for his exclusive benefit the track was extended in front of and to the lower end of his sheds, and he caused crossings to be laid in front of his shed doors which he paid for, both the planks and the labor of laying. The track in front of Emery's sheds was used solely for Emery and for his private business. The crossings were on Emery's right of way into his sheds, and were used exclusively as a means of access thereto, and in connection therewith, by him and persons there on his private business.

No repairs to the crossings, or any agreement therefor, were ever made by the lessor, or by the defendants — trustees under his will, or by their orders; but it was always understood that the lessee was to make repairs.

Some years before the accident, the track above Emery's sheds

was raised by defendants' men and new planks were laid and spiked between the rails and on the outside of the rails, but without any authority or orders from the defendants or their agent, simply of their own accord, leaving the crossings in good order. Other than that Brown's men made no repairs upon the crossings.

Emery occasionally employed teams in hauling heading stock from his sheds to the brick mill farther up the wharf. Plaintiff had worked on the wharf for fourteen years, and was at work there when the track was laid in front of Emery's sheds; and testified that he knew every foot of the wharf. For some time previous to the day of the accident the plaintiff was employed by one Shaw, a truckman, as a driver, and had occasion frequently to go on to the wharf.

December 17th, 1888, the day of the accident, Shaw began work for Emery, hauling heading stock from the No. 4 shed to the brick mill. When Shaw arrived at the shed, on that morning, there was no plank on the outside of the rail next the passageway in the crossing in front of the shed door, and he went into the shed and brought out a three-inch plank some eight or ten feet long, and laid it down loosely outside of and against the rail.

To get into the shed so as to drive out and up the wharf, it was necessary to drive down past the door and gee off and then back into the shed. The loose plank being only ten feet long, it was necessary to move it down the wharf before backing in, and up the wharf before driving out. About one o'clock the same day, the plaintiff came to the wharf with another jigger and replaced Shaw's other driver. The horse, the plaintiff was using, was somewhat quick and nervous, especially about backing.

The plaintiff rode down the passageway past the door, and after backing and filling three times, suceeded in getting into the shed, the hind wheels having gone over the loose plank each time in backing on and driving off the crossing. When loading, the jigger and horse were entirely inside the shed. The plaintiff loaded the jigger, and mounting the seat, drove out of the shed

over the crossing and up the wharf.   Coming back again, the plaintiff drove down past the shed door, got off, and went back to the crossing, and moved a piece of joist that was in the crossing so the wheels would come right, and then, getting on to the seat, backed and filled again several times and finally got into the shed.   In backing in, however, the plank was moved, so that the plaintiff complained of it to Shaw, and said the plank was loose and ought to be fastened down, and Shaw told him that he ought to take his horse by the head and back him in.

After loading the second time, knowing the planks were decayed badly and worn between the rails, he got upon the seat of the jigger, and, with only one foot resting on the toe-rail, and the other hanging loose, he drove out of the shed on to the crossing and turned to the left to go up the wharf.   The horse moved quickly over the crossing, and the wheels going upon the loose plank lifted up or canted the jigger and the plaintiff was thrown or jumped off the jigger, and his leg was broken.

The plaintiff, while lying on the ground, told a witness that he "thought it was a bad piece of business, that the plank couldn't be spiked on, that they were loose and it was an unsafe place to go over."

Neither of the defendants personally, nor any of their agents or workmen, knew that the plank was missing, nor that a loose plank had been placed against the outside rail at the time of the accident.   Neither Brown nor the defendants ever gave their agent any orders, nor did their agent ever give any orders or authority to any of the workmen to make any repairs on the leased premises or on the planks or crossings in front of Emery's sheds; and that it was always understood that Emery was to make all such repairs.

It was claimed by the defendants, upon the evidence in the case, that the railroad track along the easterly front of the sheds, owned and occupied by said Emery, was built entirely for his convenience and planked at his own expense at the crossings in front of the doors and elsewhere; and that the crossings in front of the doors of those sheds were used solely by Emery

as appurtenances of the leased premises and part of the same, and for no other purpose; and that the crossings in front of the doors of the sheds were as much in the occupancy of Emery as any part of the leased premises. It was also claimed, beyond this, by the defendants, that the whole track, not only at the crossings, but in front of the whole length of the Emery sheds, was no part of the travelled way down the wharf but was used solely by Emery and was included in his occupancy; and that there was no duty or liability upon the defendants to keep the same in repair; and further, that this was true in any event as to the plaintiff, who, they claimed, was upon the premises at the time of the accident on business solely with Emery and was using the crossing merely as the means of access to Emery's sheds.

The defendants submitted several requests for rulings based upon their claims as above stated, but the view taken by the law court renders a report of them unnecessary.

The defendants excepted to the following portion of the presiding justice's charge: "The owner is not exonerated from the consequences of his neglect to maintain an access to his place of business safe and convenient because the property may be in the possession of his tenant. Within the limits of the tenancy a tenant is under obligation to repair and maintain the property occupied by him in a reasonably safe and convenient manner, but he is not obliged legally, as far as the public is concerned, to maintain in a reasonably safe and convenient manner, access to it over the property owned by another; that responsibility rests upon the owner himself. So if the spot upon the wharf where the accident occurred was not within the limits of Emery's tenancy, not within the limits of the territory occupied by him, then the owners of this property having leased it to Mr. Emery, are under the duty to all persons who do business with Mr. Emery, to provide a reasonably safe and convenient access to that property. In other words, having leased this property at the foot of the wharf to Mr. Emery, they are bound to provide reasonably safe and convenient access over their own property at the head of the wharf down to the property leased by Mr. Emery, and are under a duty to all persons having business

with Mr. Emery to maintain that access in a reasonably safe and convenient manner."

The plaintiff contended that the railroad track at the point opposite number four shed and opposite the other sheds of Emery, was under the control and in the occupancy of the defendants themselves. He claimed that this was shown by the action and conduct of the defendants and their servants in the repair and control of and their conduct toward that track. He claimed to have shown that the place where the accident occurred, the place where the plank lay outside of the eastern rail of the western track, was under the control of the defendants, and not of Emery.

The court in its instructions to the jury left the question, whether the crossing was included in the premises leased to Emer , as a fact for them to determine.

*Drummond and Drummond, W. H. Looney* with them, for plaintiff.

Whether certain premises are parcel of and included under those demised is matter of evidence. Taylor L. & T. 3d ed. § 163; *McIntire* v. *Talbot*, 62 Maine, 312, and cases cited; *Elliott* v. *Pray*, 10 Allen, 378; *Cunningham* v. *Bank*, 138 Mass. 480; *Priest* v. *Nichols*, 116 Mass. 401; *Cram* v. *R. R. Co.* 45 A. & E. R. R. Cases, 544. That negligence may be regarded as the proximate cause of an injury, of which it may not be the sole or immediate cause: *Lake* v. *Milliken*, 62 Maine, 240; *Ricker* v. *Freeman*, 50 N. H. 420; *Eaton* v. *R. R. Co.* 11 Allen, 500; *Powell* v. *Deveney*, 3 Cush. 300; *Lane* v. *Atlantic Works*, 111 Mass. 136; *Cayzer* v. *Taylor*, 10 Gray, 274; *Grand Trunk Ry.* v. *Cummings*, 106 U. S. 700; *Elmer* v. *Locke*, 135 Mass. 575; Sher. & Red. Neg. 3d ed. § 10; Whar. Neg. 2d ed. § 145; 2 Thomp. Neg. p. 1088, § § 5, 6. Counsel also cited: *Low* v. *Ry. Co.* 72 Maine, 313; *Tobin* v. *R. R. Co.* 59 Maine, 183; *Campbell* v. *Sugar Co.* 62 Maine, 564; *Stratton* v. *Staples*, 59 Maine, 94; *Barrett* v. *Black*, 56 Maine, 498; *Buzzell* v. *Laconia Co.* 48 Maine, 113; *Wendell* v. *Baxter*, 12 Gray, 294.

Instructions: Leasing wharf to different tenants gave tenants

right only to use passage way in common without liability to repair. *Sawyer* v. *McGillicuddy*, 81 Maine, 318, citing cases, *supra; Milford* v. *Holbrook*, 9 Allen, 17 ; *Shipley* v. *Associates*, 101 Mass. 251 ; S. C. 106 Mass. 194 ; *Larue* v. *Hotel Co.* 116 Mass. 67 ; *Looney* v. *LcLean*, 129 Mass. 33 ; *Watkins* v. *Goodall*, 138 Mass. 533 ; *Learoyd* v. *Godfrey, Id.* 315 ; *Readman* v. *Conway*, 126 Mass. 374.

Motion : Counsel cited cases *supra* and Sher. & Red. Neg. 3d ed. § 414; *Whittaker* v. *West Boylston*, 97 Mass. 273 ; *Mahoney* v. *R. R. Co.* 104 *Id.* 73 ; *Lyman* v. *Amherst*, 107 *Id.* 339 ; *Gaynor* v. *R. R. Co.* 100 *Id.* 208–212 ; *Chaffee* v. *R. R. Co.* 104 *Id.* 108–115.

*H. R. Virgin, J. W. Symonds* with him, for defendants.

WALTON, J. The plaintiff has obtained a verdict for two thousand dollars against the trustees of the estate of the late John B. Brown, for injuries claimed to have been received through their negligence. The case is before the law court on motion and exceptions.

We think the exceptions must be sustained. The negligence complained of was the omission to keep in repair a railroad crossing on Brown's wharf in Portland. The crossing led into a lumber shed owned by one Mark P. Emery, and the crossing was built for and used exclusively as a means of entrance to the shed. It was admitted that the shed stood on land owned by the Brown estate ; but it was denied that the estate or the trustees were under any obligation to keep the crossing leading into the shed in repair. Upon this point the jury were instructed as follows :

" Within the limits of the tenancy, a tenant is under obligation to repair and maintain the property occupied by him in a reasonably safe and convenient manner; but he is not obliged legally, as far as the public is concerned, to maintain in a reasonably safe and convenient manner, access to it over the property owned by another ; that responsibility and burden rests upon the owner himself; so if the spot upon the wharf where the accident occurred was not within the limits of Emery's

tenancy, not within the limits of the territory occupied by him, then the owners of this property having leased it to Mr. Emery, are under the duty to all persons who do business with Mr. Emery, to provide a reasonably safe access to that property."

This ruling seems to be the exact opposite of what the law is. The law requires every one having a place of business to which he expressly or impliedly invites others to come to do business with him, to maintain a reasonably safe means of access to it, notwithstanding such place of business is upon leased land, and notwithstanding the means of access to it is over the land of another. And the responsibility and burden of providing such means of access to his lessee's place of business does not rest upon the lessor or the owner of the land over which such access may pass. And in these particulars the ruling seems to be the exact opposite of what the law is.

A way, *ex vi termini*, implies a right of passage over another's land. As an easement, it cannot exist without a servient as well as a dominant estate. "The way must be kept in repair by the owner of the easement, and not by the owner of the land over which it passes." Per Morton, J., in *Jones* v. *Percival*, 5 Pick. 485.

"The owner of the soil was under no obligation to repair the road, as that duty belonged to the party for whose benefit it was constructed." Per Ruger, C. J., in *Herman* v. *Roberts*, 119 N. Y. 37 (1890).

The lessor of a building is not liable to one who, in passing along a walk leading from the street to a building for the purpose of transacting business with the tenant, is injured for want of a railing, although the premises were in that condition prior to the letting. "The occupier of a building, who negligently permits the building, *or the access to it*, to be in an unsafe condition, is liable for an injury occasioned thereby to a person whom he by invitation, express or implied, induces to enter upon it." Per Morton, J., in *Mellen* v. *Morrill*, 126 Mass. 545.

"The duty of the tenant to keep in safe condition the demised premises extends to all the appurtenances connected therewith, and this includes steps, stairways, and other approaches." Per Elliot, J., in *Purcell* v. *English*, 86 Ind. 34.

It is suggested by the plaintiff's counsel that the ruling may be sustained upon the ground that when there is but one stairway or passage leading to several tenements, the duty of keeping such stairway or passage in repair remains with the landlord.

It is impossible to sustain the ruling upon that ground; for, in the first place, the ruling was not placed on that ground; it was placed on an entirely different ground; and, in the second place, the evidence would not have justified resting it on that ground, if it had been the intention of the presiding justice to do so.

The plaintiff claims to have been hurt while using the crossing leading out of Emery's shed; and the exceptions state and the evidence shows that this crossing was constructed for no other purpose than to furnish a convenient way to and from the shed, and that it was never used for any other purpose. It was not a way used in common with other tenants. It was an appurtenance belonging exclusively to Emery's lumber shed, and used exclusively as such. And the fact must not be overlooked that this crossing was something separate and distinct from the railroad passing by the shed, and something separate and distinct from the carriage road leading down the wharf. It was constructed of planks and extended only about ten feet from the shed. And it is claimed that, as the plaintiff was driving out of this shed with a load of lumber, a loose plank in the driveway tipped up on to its edge, and, as the fore wheels of the jigger passed over it, caused a jolt, which threw the plaintiff from his seat and broke his leg. Now, if it had been conceded that it was the duty of the defendants to keep the railroad in front of the shed in repair, and if it had been conceded that it was their duty to keep the carriage road leading down the wharf in repair, still, the question would have remained whether it was their duty to keep the entrance into Emery's lumber shed in repair; and we fail to see how, upon the evidence, there could have been but one answer. No contract to keep it in repair was proved, so as to bring the case within the principle on which the decision rested in *Campbell* v. *Sugar Company*, 62 Maine, p. 564. No tenancy in common, or use by several tenants, was proved, so as to bring the case within the principle on which

the decision rested in _Sawyer_ v. _McGillicuddy_, 81 Maine, 318. Whether the driveway leading into Emery's shed was or was not wholly within the territory leased to him, was unimportant. It was a question that in no way affected his liability to keep the way in repair. It seems to us perfectly plain that the driveway from the lumber shed across the railroad track to the carriage way extending up and down the wharf, was one of the appurtenances belonging exclusively to the shed and the land on which it stood; and that it was as clearly the duty of the owner of the shed and lessee of the land on which it stood, to keep that driveway in repair as it was to keep the shed itself in repair; and that it was no more the duty of these defendants to watch that approach to the shed, and see that it was kept safe for use, than it was to watch the shed itself and see that that was kept in a safe condition. We think that upon this point the ruling was wrong, and that the verdict returned would have been wrong, if the ruling had been correct. We think that upon the evidence reported, the jury might have been very properly instructed to return a verdict for the defendants. _McKenzie_ v. _Cheetham_, 83 Maine, 543, and cases cited. And very full notes upon this branch of the law will be found in _Lowell_ v. _Spaulding_, 50 Am. Dec. 776; _Godley_ v. _Hagerty_, 59 Am. Dec. 733; _Zoebisch_ v. _Tarbell_, 87 Am. Dec. 661; _Welch_ v. _Wilcox_, 100 Am. Dec. 114; _Elliott_ v. _Rhett_, 57 Am. Dec. 759; _Purcell_ v. _English_, 44 Am. Rep. 262; _Bowe_ v. _Hunking_, 46 Am. Rep. 474; _Herman_ v. _Roberts_, 16 Am. St. Rep. 803; _Edwards_ v. _Railroad_, 50 Am. Rep. 659; _Wolf_ v. _Kilpatrick_, 54 Am. Rep. 672.

　　_Motion and exceptions sustained._　_New trial granted._

　　PETERS, C. J., VIRGIN, EMERY, FOSTER and HASKELL, JJ., concurred.